Doris Busch Boskey
53 Arbor Lane
Dix Hills, New York 11746
(631) 549-6975

**FILED**

IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 18 2006 ★

BROOKLYN OFFICE

Honorable Judge John Gleeson
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

CHAMBERS OF

JAN

January 8, 2005

Re: Busch v. The City of New York et. al. 00CV 5211

*The Clerk is directed to provide copies to defendants' counsel and to Mr. Beldock, and a status conference will be held on Jan. 17 at 11:10.*

Dear Judge Gleeson:

*So ordered*
*s/John Gleeson 1-12-06*

I am writing Your Honor, about the transcript from the status conference on Monday, December 19th, at 11:30. I left a message requesting a copy from the reporter, who was changed. After receiving and reading a copy from Mr. Beldock, I called and left a message on his tape indicating there were errors in the transcript to correct. He did not return my call. I then called Chambers, and then the County Clerk's office, who said I could send corrections directly to Your Honor, which I prefer to do so that you may review them, **and** the transcript as well. I informed the reporter there were errors. I didn't want to send corrections to her. Unfortunately, due to a chest injury and an infection, I have been unable to get this out sooner. I apologize for the delay.

The reason for my concern, is that there have been problems with transcripts in this case before, not only in depositions and in other forms of statements or testimony, but **also** in the civil trial transcripts. I made notes about the trial transcripts as I read some of them after the trial. Things were inserted, such as questions that were never asked or words not said, words changed or misquoted in questions or answers, incorrect civilian or lawyers' names written in, and some things said were omitted, etc. I took notes at depositions, and repeatedly found transcript errors, mostly in those done by the City, and informed our lawyers about this. I made a reference to some of this in a letter to Judge Johnson dated February 24, 2004. I have enclosed a copy of that letter without the attachments, which I assume you have on file. I also wrote, which I wanted to correct, that Gary was holding a flute in the stairwell. It was O'Brien and Gravitch who said he had a piece of wood or a flute at one point, then went for the hammer. The witnesses near Gary saw him holding only the small inscribed wood handled hammer, that officers were told was a holy object. This was said by Percy Freeman, and was also heard by a witness who was taped that night. He may have had a flute at one time, but not then. It never appeared. Other witnesses also believe they saw Gravitch as one of the shooters, not just the one referred to in the letter.

In the attachments of 2/24/04, there is a summary about the hammer lying next to Gary, and separate pages of some moving men's statements, such as P. Babb, who walked across the street and saw the hammer next to Gary and tefillin on him; C. Greene saw the hammer alongside

Gary; Olivo saw Gary 10-15 feet away from officers when he was shot; etc. The ADA, and Internal Affairs had these taped interviews the day after the shooting. Sgt. Nyhan, and EMS Sweeney saw the hammer laying next to Gary, which was heard at the civil trial, but not in the grand jury. In the grand jury they used CSU photos such as NY 000541, taken after the hammer, tefillin, etc. were tampered with and moved, along with falsely marked sketches that said "Attempted murder of M.O.S." with moved evidence marked in, as well as Gary. Sgt. Memoly and some of the officers were asked by the ADA if Busch was standing near the hammer in that photo when he was shot, to make it appear Gary was closer to the officers, instead of across the driveway near the sidewalk and steps of 1625, where he **was** standing when he was shot and fell · with the hammer, wearing tefillin. They said "yes." The ADA showed those CSU photos and falsely marked sketches to grand jurors and to witnesses. They had statements from a Mr. J. the night of the shooting, who saw a woman fire, possibly first, said Gary was 6-12 feet away from the officers, said Gary was never a threat, etc. Others also said they saw a woman officer fire among the males. It was heard in precincts, and by others. Some saw officers continue to shoot after Gary was falling or down. On 8/31/99 it was reported that a moving van across the street was hit with four bullets; one through the tire, one through the van, and two others dented the van. All of the above and more was kept out of the grand Jury, including a countdown before Gary was shot, more officers fired and were there, Percy wasn't a roommate, and one of **two** bullets to his left leg severely fractured his femur. This is some of the false and incomplete presentation in the grand jury I referred to on December 19th. Some of this and more was kept out of this case. This and below is to clarify what I said and referred to at the status conference.

Our experts and others saw photos such as 000541 (attached), and our ballistic expert used the falsely marked police sketch done for the grand jury on 9/10/99 (000536) and enlarged part of it marked B, and superimposed on that, marked F, the alleged places that only four officers and Gary were standing when he was shot (all attached). The information from the movers, EMS and others about the hammer, tefillin and more in interviews by IAB, FBI, CCRB of witnesses and officers, GO 15s, and deposition testimony, indicating more officers were there, more fired, and Gary was seen closer to the sidewalk and bottom steps of 1625 when he was shot and fell to his right with the hammer, and more, was either **not** given to the experts or **not** read, except for the autopsy. In the sketches, Gary's stairwell was **not** that large, the small tree sketched is **more** to the right near 1625, not so far in the driveway, the ballistics are **not** where they were in the photos, the small circle for blood, and one for Gary should be closer to the sidewalk and bottom step of 1625 (See 000493 attached), and the RMP was more parallel to the curb, not facing into the driveway. We didn't want this expert or the procedural expert who referred him, who sought a job with City lawyers before these reports. We wanted the reports corrected and supplemented. Critical facts, information and testimony were missing. These two reports using only limited and incorrect police and other alleged statements, were given to **all** the experts, which affected the information they received and used. This caused the elimination of officers O'Leary, Popolo, Khan Hensel and others, and was used to limit the case, the facts and some of the focus.

The background of the motion for Summary Judgment, September 11, 2003 shows calls made to police that day were about music and dancing, not about threats being made, that's true. Not all statements and information in the papers are correct. Officers were told prayers were going on in the second encounter, true. On Page 6 footnote # 3 "One civilian witness testified that one of the

female officers shot at Busch. Defendants deny the presence of female officers." On page 7, the **only** officers defendants say shot Busch, were O'Brien, Memoly, Loschiavo and Sanabria. And footnote # 4 on page 7, "it is inconclusive that Gravitch did not fire." "Further, Plaintiffs argue that <u>one</u> witness testified that she saw "a dark-haired female police officer" fire her weapon, as evidence refuting that Officer Bibi Khan-Hensel did not fire her weapon at Busch."

<u>This and more was contrary to the testimony and information</u> gathered. We also never received the firing range report for 1999 of all the officers, especially for Gravitch. The word "Latina" was put into one witness, Mr. J.'s deposition, but wasn't said. At his deposition he was shown his <u>interview on 8/30/99 by a detective, where Mr. J. said he believed a female officer may have fired first because he was watching her</u>. He also saw his two FBI interviews. In March of 2000 he told the FBI he was grilled by the ADA, who insisted a woman officer wasn't there **before** the shooting. The detective said she was. Mr. J. wasn't allowed to tell this in the grand jury, or that Busch was at least eight feet away from the officers when he was shot, and was shown a photo to mark in the grand jury that wasn't from his perspective. He said the ADA tried to confuse him, and made him mark it. In May of 2000, he picked K. H. from female officers' photos shown to him by the FBI as looking most like the officer he saw. This was referred to in his deposition, on 10/16/02. It took four months to get the transcript from the City, which had <u>many misquotes</u>, errors, <u>insertions, one of which was "Latina."</u> I told the lawyers about this and other errors. There were other depositions, CCRB interviews, FBI interviews, etc., indicating female officers there before the shooting, and placed one with a gun or seen firing basically in the same area. She was described by almost all as: dark hair tied back, not too tall, thin to medium, etc. One said she looked Asian. Some also saw a blond female there. Some also saw or heard officers in the street.

Your Honor, there was enough testimony and information to warrant a full investigation by others, as well as to support what was in our original amended Complaint of 2001. In 2002 our lawyers began to change the focus to substantive due process, and other things that weren't necessary, against our wishes. Gary had turned off the music earlier, and was appropriately dressed. What happened in the second encounter and the cover-up after that was significant, as well as all the officers and others involved. Gary was inside, in the middle of prayers. Percy, who also had problems, was someone Gary had only met and shared his food with once the week before, who came back that day. Percy was gripped up the steps without cause. Gary, standing in the stairwell with the hammer at his side, was pepper sprayed without cause. He began screaming in pain, couldn't see or breath and tried to get up the steps and away from **his** attackers. They followed, surrounded, crouched in position, <u>counted</u> down, then fired as he stood screaming, holding only the small inscribed hammer. He wasn't a threat either before or when he was shot.

<u>I repeatedly tried to get the lawyers to correct papers, records, reports, transcripts</u>, etc. submitted by both sides, and to include accurate and significant information and testimony. That included all pre-trial papers, affidavits, what was presented at trial, motions, post-trial papers, Memorandums etc., even information in Judge Johnson's decisions, and in answering papers. **All** defendants should have been included. Other important witnesses should have testified, and additional testimony and information given to reveal further compelling facts: the music that annoyed a neighbor, the correct time line, the additional officers, shooters, the countdown and more. The trial shouldn't have gone forward with the jury selected before a magistrate on

10/20/03, where at least five jurors had ties to police. One, a court officer, who later became foreman, and a woman whose cousin is a police officer, were sitting behind me that day. There was a lot of talking. Another whose son is a corrections officer, fell asleep every day, once off the chair, and there were more with close ties to police, possibly to a few of these officers. An occasion arose to eliminate the court officer on the first day of trial. Nothing was done. The eye contact was apparent from the start, as were other reasons for concern. Had something been done earlier, or at least during the trial, or before the verdict, over two years ago, we would not have to go through this whole thing all over again. It was obvious the jury verdict, after only five and a half hours of deliberation, was against the weight of the evidence. Something wasn't right.

This has impacted on both of us, and the family for six and a half years. Not only was it painful for me to lose a son, knowing he died in such a brutal way for no reason, it is also the cover-up and false portrayal that followed, and all of this. This has been draining emotionally, physically and financially and I need the time to determine my physical health, as well as my husband's, and other issues, including issues of the case. The stress has affected my health and my husband, and increased my blood pressure problems. My stamina and resistance has been at an all time low, especially in the last few years. I have had difficulties again over the last three weeks, which is why I was unable get this out sooner, or get anything done since the conference.

It is very difficult to have to go through this and another trial again, knowing that some officers involved in killing my son, and those involved in covering it up have been eliminated, along with many significant provable claims. This shouldn't have happened. There is no real justice or closure here. No amount of money will ever replace my son and what was done to him, or to us. There are many good officers and officials who deserve to be supported. But there are some officers who have a propensity for uncontrolled aggressive behavior, for lying and for covering up their actions, and there are those who cover-up the actions of others. This is wrong.

Perhaps this letter will help to clarify some of what was said at the conference. I know I spoke quickly, and the reporter may have gotten some things out of sequence, or misunderstood what I said. Some things in there weren't said, and others things that were said are missing. Thanking you for taking the time to read this letter with attachments, and for allowing me the opportunity to speak at the conference. Again, I apologize for the delay in sending this out.

Sincerely,

Doris Busch Boskey

Enclosed:
Transcript of status conference 12/19/05 (4 pages)
My corrections to the transcript (4 pages)
Letter to Judge Johnson dated 2/24/04 (6 pages)
CSU Photo NYC 000541
CSU Photo NYC 000493
CSU police marked sketch NYC 000536 dated 9/10/99
Expert's enlarged section of 000536 sketch marked B and sketch marked F.

Doris Busch Boskey
53 Arbor Lane
Dix Hills, New York 11746
(631) 549-6975

Honorable Judge Sterling Johnson
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

February 24, 2004

Re: Busch v. The City of New York 00CV 5211

Dear Judge Johnson:

I write to your Honor out of desperation. I can no longer remain silent and accept what was clearly a perversion of the truth about the pepper spray and killing of my son Gary (Gidone) Busch on August 30, 1999, about him and the cover-up that ensued. I have carefully reviewed the record and can say with certainty, that what has been submitted and presented was and continues to be often false, inaccurate, or purposely incomplete. The City's lawyers have even accused witnesses of colluding, changing statements, and me of trying to influence them. Police and the prior administration immediately went to work covering up and looking for ways to justify this shooting. They never even called us that night, but admitted Gary to the hospital as "John Doe Homeless," although they were in his apartment, had his driver's license and my car registration. We found out hours later on the news. My calls for their help and answers went unreturned. They released false stories to influence the public and community about the shooting, about Gary, and about Percy Freeman who was **not** a roommate but a visitor that day. Gary had plans with his fiancé that night. I wanted to testify but wasn't called. In this civil case, at least four or more jurors had family, friends or were themselves connected to police, a concern in this case (See Jury page 4). Please read this letter and attachments and perhaps you will see why I felt compelled to write, and to request a conference if possible.

The officers and those involved, had the opportunities and motives to tamper with evidence and collude at the scene, in their cars, at the hospital, the precinct, the Borough office before the grand jury and thereafter, even before and during trial. Eight, including Popolo and Khan Hensel also met in the summer of 2002 with City lawyers, experts and others in Corporation Counsel's office and at the scene to coordinate their story. See Gravitch deposition pages: 78-89, 278-281.

Witnesses were afraid of repercussions from the police. They had **no** lawyers, **no** representatives, were intimidated, and had language and cultural problems. They saw the truth was not told by police or the City, and wasn't exposed in an inaccurate presentation before a grand jury, hastily convened within a week. Some have said their testimony was cut and controlled by the Assistant D.A. and they couldn't tell all they saw when Gary was shot, only answer limited questions. See Templar, Kaufman, Sears, Eisenberg, Rokeach. A crime scene photo was shown of the hammer in the driveway, taken after it was moved away from Gary, see photo 000541 attached, across the

driveway and the wall where he fell (000494). It was used to make it appear as if Gary was standing there, closer to officers when he was shot. Note Eisenberg deposition 348-353. Gravitch crossing off Eisenberg's name, a woman officer seen firing, Gary's fractured femur among other things were kept out. Criminally negligent homicide was **not** given as an option to indict, and the officers were exonerated. The Justice Department was unaware of the evidence tampering. They never questioned the six male officers or read all GO15s, any CCRB interviews, or depositions which weren't available at that time, only limited testimony. They sent a letter to Internal Affairs in June of 2001 stating that Gary was not moving forward or lunging when he was shot and noted the possibility of collusion on the part of the officers (see attached.) Internal Affairs just asked officers if they colluded, which they denied. Since that letter was revealed before this trial, the City's lawyers have tried to make it appear that witnesses, not officers, colluded. I have now been included as well, to take the focus off the police and the cover-up which has been avoided.

That photo of the moved hammer in the driveway was shown at this trial and explained, as was Gravitch's memo book where he crossed off a witness' name. Both revealed here, but ignored. Officers Popolo and Khan Hensel who were there, one seen with a gun, were again excluded.

EMS Sweeney saw the hammer next to Gary before it was moved, as did Sgt. Nyhan and others. (See attached summary and some excerpts) Loschiavo in his CCRB and GO 15 says after Busch was shot, he fell right where he was standing. O'Leary placed Gary 15 feet away, in front of the brick wall before he was shot. Memoly placed Gary where the girl is with the umbrella (attached photo 000483) close to where he fell, before he "allegedly lunged." Gravitch said in the grand jury Gary took a step to the right, a step back and fell, but said he was 8 feet away before he allegedly "lunged." Witnesses saw him fall close to where he was standing. The report from the scene was 15 discharges, yet only 12 casings were found they say 13 shots fired based on only 4 guns. Only 4 bullets were retrieved from Gary, and 2 deformed ones near a police car. He was hit by twelve. Four hit a moving van diagonally across the street and weren't retrieved; one broke a lamp inside. The back of the van was near the turquoise awning in photo 000483, near 1632.

We received anonymous calls days after the shooting that there had been an illegal search of Gary's apartment and that gun clips were changed. We also heard a woman officer shot Gary.

I have been to every deposition in search of the truth over fifty, of all defendants, detectives, other police officers, witnesses including Ianovitch, Dr. Catanese, experts, Safir, etc. I have read documents, listened to tapes, read testimony of all officers seen deposition and taped interview transcripts, 911 calls, reports and diagrams, that are not always accurate or complete, especially when police or the City's lawyer's are involved. Information gathered over the years provided enough evidence to show Gary wasn't a threat to police; wasn't lunging; that there were more than six officers involved including officers Khan Hensel and Popolo; that more than four fired including a woman; that evidence was tampered with, and there was a cover-up and false portrayal which continues. Some information about the shooting was ignored early on. See IAB Sgt. Lott IAB: 210-217, 258-265, 290-305.

O'Brien small abrasion was probably from his struggle with Percy. Photo 000503 of abrasion and deposition 358-361, says he used his left arm to drag Percy up, and CCRB pages 56-58, he

describes Percy kicking, shoving, resisting, arm stuff, he's a pretty big guy. Percy hits him, see attached. Brick walls are on the sides of steps and a metal hand rail on the right side going up. O'Brien weighed 195 pounds then, lifted weights and was a Rugby player. Gary was 159 pounds.

Gary's body had multiple abrasions and contusions all over, as well as a fractured left femur, and 19 holes, including a shot to his back from a Glock. The women officers had Glocks. He was hit 12 times. Two to his right arm, two to his left leg, one to the right leg, as well as center mass.

It was City lawyers who called witness' depositions besides some others, and picked the places to hold them, including the Kaufmans at their "dining room table." I had never been there or met them before or since. Ms Juneja contacted and spoke with witnesses before their depositions. . City Lawyers met with and prepared all the defendants for hours as well as all police and City employees before their depositions and any other testimony they gave.

Witnesses noted prior inaccurate statements when shown them at depositions. They were intimidated at this trial, as they had been by the ADA. The Kaufmans live directly across from 1625, the steps Gary was close to when he was shot and fell. See marked photos attached 000491 and in # 491A, their house and also the Rokeach house to the left near the awning where the moving van had been parked, not down the street as Ms. Rossan said at this trial. See the flag. Mr. Kaufman told Scheiner who deposed him, sketches used in the grand jury that he brought were wrong and he also noted incorrect quotes in police reports, such as swinging. See attached dep. pages 93, 105-107. He did say was Gary was trying to get away, he would not go back to them. attached dep. pages 128-130. See Rokeach CCRB attached also.
Mr. Templar, who Scheiner also deposed, also noted what the DA's memo said at his deposition. They had asked him also if Gidone was "swinging" the hammer and he said "no. Maybe it's his English." attached pages 89 &137. The same with Mr. Tyberg who said Gidone was swaying in place, as if he couldn't balance himself physically: pages 61- 63, 113- 120, 159. Page 151-152. Police and the Lawyers continually used and suggested "swinging."

These and others spoke to IAB, FBI, CCRB, depositions, etc. They tried to describe what they saw from where they were standing. Unsteady, swaying and screaming would be from severe pain of pepper spray, as well as blindness, disorientation, difficulty breathing, and fear. He was asthmatic, had breathing problems, and wasn't wearing glasses. They saw he was not a threat.

Isopropanol was in his eyes and in the canister used. Gravitch sprayed it directly in his eyes and face. The canister had 10% pepper solution with Isopropanol detected. It was tested on 9/1/99, the same date and place as Gary's lab test. Another on 10/14/99 shows the difference between a full canister and the one used as 12.0296 grams (a half ounce.) See attached documents 00370, 002815. See two pages, someone sprayed from 2/22/98. Note: Immediately after he was sprayed, Christianson began to scream. "I felt this incredible burning, loss of breath, excruciating pain etc. Dr. Stopford questioned at trial page 895 Lines 3-5 by Ms. Juneja was asked "how could it have worked when civilian testimony was that he was screaming as he ran up " He was asked about screaming and noises, not about hitting an officer. See what follows it. This is incorrect as are other things. He testified Gary couldn't have looked Gravitch in the eyes. He couldn't have opened them. It is physically impossible, but he said to make it appear it didn't work. Stopford

mentioned the canister tests and it was also part of the autopsy report. Dr. Vasallo did not see these, nor significant things such as Gary's asthma problems, or his need for glasses to see with.

O'Brien, officers and Gary:. Gravitch says O'Brien was on the second or third from the top, in his deposition, and the first or second in his CCRB with Gary at the bottom in the stairwell when he sprayed him. Loschiavo never saw O'Brien on the stairs at all, heard the scream, and saw Gary coming up and going past him across the driveway. He didn't see Gary hit anyone. O'Leary changes his statements from no interaction, to hitting his gun because he heard a clank, etc.

Mr. Eisenberg: I spoke to him on the phone about 5 or 6 times, over four years. He spoke to media and was interviewed well before I even knew of him or anyone. The first phone call was when he told me he saw Gary killed and the truth wasn't being told by the police or the City. Once he told me about a drawing he did. The first time I ever saw him was at the first memorial a year after Gary was killed I **never** met **with** him. The next time I saw him may have been at his deposition in March of 2002. I never spoke to him between his depositions, or at them, only months later on the phone in December of 2002 about an exhibit of his, which I never went to. Memorials are usually held where people have been killed. Nothing to do with witnesses.

Important: Eisenberg's drawing: He didn't see Memoly inside the driveway, who is not in his sketch, nor would anyone with that view. Even the officers didn't. He thought Gravitch may also be one who fired because he recognized his shape. In Eisenberg's CCRB tape and transcript he says he heard other officers in the street to his right, out of his line of vision but close to the scene of the shooting. They are also not in his sketch, which accounts for people seeing only four or five officers from that perspective. The woman officer seen firing was seen closer to the street by several people, not just one as the papers submitted say, and was **not** described as Latino.

The Jury in this trial: There was constant eye contact between a few jurors and some of the defendants: one was a Brooklyn Court officer from Suffolk County, who became foreman. He didn't go through metal detectors at lunch break. Another had friends who are police officers, and lives in Suffolk, as did Loschiavo who he was in eye contact with. Another right behind him seemed to also. He later spoke to the press. One juror had a cousin who is a police officer and another had a son who is a corrections officer, and fell asleep, once falling off the chair. How could jurors with family or friends who are officers, or themselves have ties to police or the City, be on a jury in a case against police and the City and render a fair and unbiased verdict? After a four week trial and a weekend off in between, they met on a Monday with a verdict in only five or six hours based on a witness who backed the police, but whose testimony conflicts with the officers, witnesses and the medical examiners. See Ianovitch.

 City Lawyers at trial introduced and had witnesses mark a survey Defendants 450, part of which was taken from a smaller cutout of plaintiff's exhibit 1A. Gary's side of the street which was all marked, and was smaller in scale to the street, and across the street. Mr. Beldock said at trial it was not authenticated. Witness markings should not have been accepted. They are incorrect as was their diagram A photo attached #491A, noted before, clearly shows Rokeach's house is diagonally across, the moving van was parked near the awning. The station wagon seen in this picture was the one in the driveway in crime scene photo 000541. See also 000494 attached

which shows the rest of the wall and the blood stain match. That large station wagon was missing in the photo that the City and Krivosta used to show where the officers and Gary were allegedly standing. The driveway was too narrow in their photo, and it's also inaccurate. Memoly had to be closer to 1625, hidden by the wagon. No one saw him. Other officers seen firing were omitted.

Ianovitch took the photo of Gary with a zoom lens. At this trial he said Gary was one foot away when he was shot. He never said that before. There was no soot or stippling on the body, and no powder residue in the wounds indicating no close or intermediate fire. In his deposition Ianovitch says Gary appeared to be falling at the police, and other officers on the side of the sidewalk kept shooting. After he was shot, he says Gary took a step or two back and fell. He talks about a problem being from and working in the community, however, he said he does not know people in Boro Park, when given names of witnesses, because he lives in Williamsburgh, and is not from the neighborhood. See attached 97-100, 113-120. The story about Jacobowitz and others makes no sense. These people hardly talk much to each other.

The night Gary was killed his fiancé went to pick him up to attend a wedding, not knowing he had been killed by police. At the hospital, when she wanted to call me, detectives told her falsely I was called. Police were inside his apartment from 7:10 PM on trying to get into his voice mail and other things, rather than calling us. They had Percy Freeman sign a false statement at the precinct later that night giving permission to search. They convinced people he was Gary's roommate. The ADA and police controlled everything Percy did and said.

Police knew Gary wasn't a threat. Percy said everything is okay, there are prayers going on, leave us alone, the hammer is a religious object as Gravitch said. When O'Brien came, Gary was in the stairwell with a flute. There was no reason for O'Brien to have gone down after Percy and violently pull him up onto the driveway. No reason to pepper spray Gary in the stairwell in front of his own door. They should have backed off and asked questions. Percy would have gone back to the City. Gary's fiancé was picking him up to go to a wedding and if there was a problem, he would have gotten help. They could have called family. Gary wasn't an EDP like the one in the video. Gary wasn't attacking, they attacked him. He only lived there 8 months after moving from Long Island and just completing computer college courses with a 3.9 average. He was beginning to do web designs, finished a book of poetry, was looking for a job to earn a living and getting his life together. That chance was taken away. Many people have emotional problems but can do great things. Innocent people continue to get killed because police draw guns too quickly; patience saves lives

What shocks the conscience is how they treated Percy Freeman, and how they brutally assaulted Gary in his front of his own door. Then as he tried to get away from his attackers, they followed, surrounded and shot him with the intent to kill him, then huddled as he lay bleeding. They tampered with evidence, covered up and demonized Gary rather than looking at their own abusive actions, or admit they did something wrong. Instead they sought to justify this killing with a false portrayal of Gary. After over four years of fighting for truth and justice for Gary, and for changes, there is no peace, only continued pain. He continues to be assaulted, as we all are. No apologies, no admission of wrongdoing on the part of the NYPD or the City. Now they want to sue us for the cost of brutalizing and killing him, taking away his life, his dignity and his

legacy, and taking away a piece of our lives as well. To accept this intentional shooting as justified is to perpetuate this kind of abuse. Those who witnessed this shooting and were afraid to come forward for fear of the police, will have those fears reinforced. They felt there was no justice after seeing what happened in the grand jury, and now they will be convinced. I only hope the verdict will be set aside in this civil case. Only then can there be a chance for some serious changes in the way all people are treated.

Thanking you in advance for reading this very long letter and attachments. It is something I have been putting off for weeks.

Sincerely,

Doris Busch Boskey

Attached:
1. Gravitch miniscript deposition pages 78-89, 278-281
2. Templar deposition 109-111
   Eisenberg deposition 348-353
   H. Kaufman deposition 137-138, 153-154
   Sears miniscript deposition 14-17
   Rokeach CCRB 74-75
3. Crime Scene Photo 000541 and 000494
4. US Attorney Eastern District of NY. To NYPD IAB 2 pages
5. Summary of statements about the hammer
   Sweeney 2 pages CCRB
   Nyhan miniscript deposition 258-261 and Nyhan CCRB page 26
   Perry Babb a mover: interview 8/31/99 IAB transcript of tape pages 9 & 10 and document
      summary of that tape IAB 0008334-000835
   Clifton Greene a mover: pages 3-5 from IAB interview tape transcript.
   Memoly Grand Jury pages 23, 25, 36 and Crime Scene Photo 000483
6. Lott miniscript:210-217, 258-265, 290-305 (said 105 by mistake in letter)
7. Crime Scene photo of small abrasion O'Brien's arm with ruler, O'Brien deposition miniscript
   pages 358-361, O'Brien CCRB pages 56-58, O'Brien report of wrist abrasion
8. Kaufman 93, 105-107, 124-125, 128, Templar: 87, 139
   Tyberg miniscript 61-63, 113-120, 151-152, 159-161, Rokeach CCRB Summary 2-3
   Crime Scene photo 000491 Shows Kaufmans first floor window, and photo #491A Kaufman
   and Rokeach houses. Van was parked near awning. Marked
9. Pepper spray canister tested 9/1/99: 00370  10 % pepper solution. Isopropanol detected
   002815 10/12/99 difference between full canister and one used: 12.0296 about ½ ounce
   2 pages on it's effects on a person sprayed 2/22/98: began to scream, loss of breath lasted 45
minutes, everything is a blank, just excruciating pain. No memory. Justice Department says on
contact mucus membrane of the eyes, nose and throat immediately become inflamed etc.
10. Ianovitch: miniscript: 97-100, 113-118

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - X
DORIS BUSCH BOSKEY, ET AL  :
Plaintiffs,   OO-CV-5211 (SJ)
v.    :  U.S. Courthouse
Brooklyn, N.Y.
THE CITY OF NEW YORK, ET AL,   :
Defendants.  :  TRANSCRIPT OF PROCEEDINGS
December 19, 2005
- - - - - - - - - - - - - X  11:30 a.m.
BEFORE:
HONORABLE JOHN GLEESON, U.S.D.J.
APPEARANCES:
For the Plaintiff:   MYRON BELDOCK, ESQ.
ROBERT L. HERBST, ESQ.
For the Defendant:   OFFICE OF THE CORPORATION COUNSEL
FOR THE CITY OF NEW YORK
By:  JENNIFER ROSSAN, ESQ.
KANIKA JUNEJA, ESQ.
ALAN SCHEINER, ESQ.
Court Reporter:   Holly Driscoll, CSR
.    225 Cadman Plaza East
.    Brooklyn, New York  11201
.    (718) 260-2469
.    Proceedings recorded by mechanical stenography, transcript
.    produced by Computer-Assisted Transcript.

## Page 2

1       THE CLERK:  Busch versus City of New York.
2       THE COURT:  Good morning.
3       THE CLERK:  Will the parties please state their
4  appearances.
5       THE COURT:  Come on up to the lecterns please.
6       MR. BELDOCK:  Good morning, Your Honor.
7       THE COURT:  How are you?
8       MR. BELDOCK:  I'm fine.  As you know, I'm Myron
9  Beldock, I represent -- at least I'm attorney of record for
10  the plaintiffs.  My representation is questionable, as you'll
11  learn.  I'm here with my partner, Robert Herbst.
12       MR. HERBST:  Hello, Your Honor.
13       MR. BELDOCK:  And with Doris Busch Boskey who is the
14  plaintiff since she has been substituted as the executrix of
15  the estate of the late Gary Busch.
16       THE COURT:  All right.  Good morning to all of you.
17       MR. SCHEINER:  Good morning, Your Honor, I'm Alan
18  Scheiner, I represent the City and the individual defendants
19  in this case as do my colleagues.
20       MS. ROSSAN:  Jennifer Rossan for the defendants.
21       MS. JUNEJA:  Kanika Juneja for the defendants.
22       THE COURT:  Good morning.
23       MR. BELDOCK:  Your Honor, let me start, if I may,
24  because my client is here and wants to address the Court and
25  the first issue is her request for an adjournment of the

## Page 3

1  status conference so that decisions about a retrial schedule
2  will not be made until she has the time to make the decisions
3  and obtain new counsel that's her choice.  We are not
4  retained.  Indeed, we are formally unretained.
5       If we're going to proceed in this case, it would
6  have to be on a new written retainer with certain arrangements
7  which I've conveyed to our client and at the moment we have no
8  positive response in that regard.  Even if we did, it might
9  not be possible because of our client's concerns about how the
10  case should be retried.
11       I don't think I have to go into any further detail
12  about that.  If I have to at some point, I will, but those are
13  serious concerns and, therefore, she is seeking an adjournment
14  until the end of January to make a determination as to whether
15  she will have new counsel, whether she might try this case pro
16  se, whatever, and has continued to be, as I explained to
17  Your Honor the last time we requested an adjournment, I would
18  say she's been chronically ill, coughing and sick and has a
19  heart doctor appointment in a couple of days, she's had rapid
20  heartbeats, etc.
21       I'm sure that she has been ill for this whole period
22  of time and that has distracted her seriously, as has the
23  illness of her husband who is out there, that's Howard Boskey.
24  Both of them have been ill for a continual period of time and
25  it has distracted her from being able to focus appropriately

## Page 4

1  on the decisions she has to make.  They are important
2  decisions, this is an important case both to the family and to
3  the public and if you want to hear from her, she certainly
4  would want to speak and if you want to hear from Mr. Boskey.
5  At this point I would yield to her.  I think that that would
6  be best actually.
7       THE COURT:  Before I hear from her, is there any
8  opposition to the requested adjournment?
9       MR. SCHEINER:  Your Honor, the City and the other
10  defendants would consent to a limited adjournment for the
11  plaintiff to obtain new counsel but we would limit that
12  adjournment to 30 days and we would like a stern order from
13  the Court that the plaintiff must either appear pro se or have
14  retained counsel by the end of that 30 days or the case will
15  be dismissed for lack of prosecution.
16       The reason for our request, Your Honor, is that it's
17  has been over two years since the first trial started, it's
18  been over two years since the judge's first retrial order and
19  it's been three months since the judge denied our motion
20  responding to that order and referred the case to you and we
21  feel that -- we don't question the plaintiff's medical
22  problems or those of her husband, you know, we don't doubt
23  that those are serious problems.  However, she has had quite a
24  long time to decide who to retain or continue to retain to try
25  this case and at this point the delay is prejudicing the

Page 5

1 defendants for the very common reasons that over the course of
2 time inevitably there is a risk that witnesses become
3 unavailable as well as that people's memories fade and we
4 think that the plaintiff does not have an absolute right to
5 change counsel in midstream if it is going to prejudice the
6 defendants and we think that she's already had plenty of time
7 to do that.
8     So, we request she be strictly limited to 30 days
9 and we think by that time we're entitled to know who we're
10 going to be dealing with, if anyone, and if she can't proceed
11 after 30 days, with or without counsel, then we request the
12 case be dismissed.
13     MR. BELDOCK: The history of this case, Your Honor,
14 we have never been responsible, to my memory, for any delays
15 of any kind. This is not a real delay, in this case we had --
16     THE COURT: Excuse me, what date are you asking for?
17     MR. BELDOCK: Ms. Boskey wants the end of January.
18     THE COURT: All right, I'll set a date for the end
19 of January.
20     MR. BELDOCK: January 30th or 31st.
21     THE CLERK: January 30th at 10:30.
22     THE COURT: Is that all right with everyone, that
23 date and time?
24     MS. ROSSAN: Yes, Your Honor.
25     THE COURT: Are you making an application to be

Page 6

1 relieved?
2     MR. BELDOCK: Yes, we're making an application to be
3 relieved. We're attorney of record, we're in the awkward
4 position of not being retained and, as I said, actually in
5 writing unretained and, therefore, we're in a position where
6 because of differences with the client, I would ordinarily
7 have made the application to be relieved, I thought that if
8 Mrs. Boskey obtained new counsel or made her decision we would
9 at least stand by for now and be caretaker counsel and assist
10 the Court and our adversaries and Ms. Boskey, I would want to
11 be present at the next conference unless counsel comes in and
12 replaces us, but I think the direct answer to that is, yes, we
13 are making an application to be relieved. I think my client
14 will consent to our being relieved so that I wouldn't have to
15 make an application on papers.
16     THE COURT: I'm not likely to grant that application
17 until there is a successor in place but once there is, it is
18 extremely likely that I will grant it.
19     Did you want to address the Court?
20     MS. BOSKEY: Yes. Your Honor, we have had problems
21 and have not been happy with the way the representation of the
22 case has gone. The only reason we actually began a civil
23 action was to reveal the truth about the huge cover-up in the
24 pepper spraying and shooting death of my son on August 30th,
25 1999. Critical information at that time was withheld while

Page 7

1 false information was immediately released about the incident
2 and about him to the media, the community, the public and in
3 the grand jury.
4     If there hadn't been a false, incomplete grand jury
5 convened and a hastily convened grand jury with witness and
6 evidence tampering and had criminally negligent homicide been
7 presented as an option to indict, this case would have been on
8 a different level as it should have been. However, again, in
9 this civil case, although there was important factual
10 information and testimony gathered over the last six years,
11 many critical facts were again withheld. The complaint was
12 amended three times when it wasn't necessary but by not
13 listening to repeated requests to include significant
14 information and correct the false facts and reports submitted
15 in papers by both parties before the trial the parameters of
16 this case were severely cut.
17     That caused the elimination of several defendants
18 who were directly involved in the shooting, the cover-up,
19 obstruction of justice and the release of false stories as
20 well as the elimination of significant and provable claims
21 such as conspiracy which was in many, many of the testimony
22 and facts, due process rights in the grand jury as well as
23 civil rights, equal protection and other claims.
24     There were experts who were used who used police
25 documents and premarked false sketches after evidence had been

Page 8

1 tampered with and moved that the jurors weren't aware of and
2 the grand jurors in the first instance were not aware of,
3 neither was the Justice Department and a lot of other people.
4 The moving of the hammer was just one thing and then there
5 were others such as his tefillin and whatnot.
6     This was more than a case of excessive force and not
7 following procedure. There were more than eight officers
8 there when he was shot. He was never a threat, as has come
9 out in all of the neighbors' depositions and testimony and
10 even on TV apparently that night which I didn't see, I found
11 out almost four hours later that he had been killed because he
12 had been admitted as John Doe Homeless into a hospital. He
13 was inside praying when police returned with plans to attend a
14 wedding later that evening.
15     There was tampering with evidence including the
16 hammer, tefillin, clothing, ballistics and more. Much of the
17 focus has been -- unfortunately was switched at some point to
18 the first ten minute encounter rather than the second. What
19 was most disturbing is that the other defendants who were
20 directly involved as well as significant claims have been
21 eliminated. The shot to his back and the one to the police
22 car have come from not these but from people coming up either
23 in the street or behind him people were seen.
24     Anyway, they had the facts and information, yet,
25 chose against our wishes not to use it. So, the purpose of

Page 9

1 getting truth, justice and accountability of all those
2 involved, not just the ones that this case were limited to,
3 seemed to have been lost. This really was about truth and
4 accountability and changes so that my son would not have died
5 in vain and they made it -- they made him the perpetrator
6 instead of the people that were actually involved in shooting
7 him. He was inside praying the second time they returned with
8 the tefillin.
9        Had our attorneys listened to us before the trial,
10 the jury selection, during the trial and after we would not
11 have to retry this case again two years later, over six
12 years after the incident. There were jurors we wanted to
13 eliminate due to their ties to law enforcement, including a
14 Leon Cavela (ph), a court officer, who actually came in with a
15 gun. We felt the jury had been tainted from the beginning,
16 signals and eye contact were apparent from the beginning.
17        The reason it has taken so long also is because I
18 had health problems over the last two years and there was
19 another case too that was being handled but I wanted to say
20 that I had in fact a very bad bout of high blood pressure, I
21 almost had a stroke about a year ago, so I've had a lot of
22 things and my husband has had problems, so it's been very
23 difficult to deal with this and face this.
24        I am asking the Court's permission to allow me more
25 than the usual amount of time so that I may resolve health

Page 10

1 issues and prepare to do whatever it takes to represent my
2 son's case, my going either pro se or getting some help. I
3 realize it is an unusual request but under the circumstances,
4 I know that it may take more time to prepare to do it properly
5 and I may need help, however, I've studied this case, no one
6 knows it better than I do and I guess maybe no one will fight
7 as hard as I will but I know it is a tough request but I feel
8 that I just can't allow this to happen again and, you know, I
9 will do whatever I can and whatever I can to get the truth out
10 but I'm sorry it hasn't worked out, I feel that they've tried
11 but there were very, very significant things, reports that
12 should never have been used that used police documents rather
13 than witness testimony.
14        A lot was kept out of this and, as I said, if he was
15 even admitted as John Doe, they had him hidden. Although they
16 had his driver's license, my car registration and were in the
17 apartment getting into his voice mail within ten minutes after
18 he was killed, I didn't learn about it until I saw it on TV
19 and even then I called his apartment hysterical and called the
20 police, after I found out the precinct I called the precinct,
21 no one gave me answers. He was shot at 6:50, it is in all of
22 the documents and, yet, not until after 1:00 did I finally get
23 someone who went over there to find out that it was true.
24        So, this is what's been going on. I'm sorry to have
25 taken up so much time.

Page 11

1        THE COURT: One of the reasons I allowed you to,
2 because we're just talking about an adjournment which I
3 granted five minutes ago, was to try to get some sense as to
4 whether this notion of your representing the estate pro se
5 made any sense and it could not be clearer to me, I mean no
6 disrespect to you, but it could not be clearer to me that it
7 would be an extremely unwise decision, you really shouldn't
8 even consider not retaining another lawyer.
9        I'm going to give you time to do so. I'm not
10 persuaded by the defendants that this springing dismissal
11 order ought to be entered, I'm not satisfied you're prejudiced
12 by another delay in this case. It's already very old, the
13 case has been tried; I assume that if witness' memories
14 dissipate, the preserved testimony from the earlier trial will
15 in many instances ameliorate any prejudice you suffer. You
16 haven't demonstrated otherwise.
17        You need to tend to this though, you need to get a
18 lawyer. Please don't do this pro se, it will be a terrible
19 mistake. You need to set your goals towards retaining a
20 lawyer. I expect that when you appear at the end of January
21 that you appear with new counsel.
22        I would appreciate your coming even if new counsel
23 has filed a notice of appearance, Mr. Beldock, if you would,
24 as a service to the Court to facilitate -- just in case it
25 helps to facilitate the transition and we're going to set a

Page 12

1 trial date.
2        MS. BOSKEY: Can I ask a question?
3        THE COURT: Yes.
4        MS. BOSKEY: If you know that there are reports that
5 are incorrect or if there are facts that have been submitted
6 that were incorrect and incomplete by both sides or whatever
7 through whatever they had and there is witness testimony,
8 there is documented testimony, can this be brought into a case
9 where a lot of the evidence was not submitted?
10        THE COURT: As posed, that's a question that's
11 really impossible to answer. Everything is driven by the
12 specifics. One other thing I'll mention to you, for what it
13 is worth, a lawsuit is a terrible vehicle to be making public
14 statements and be outing the truth. A lawsuit is an asset.
15 This is an action for damages, as I understand it. It should
16 be regarded as that as a way of compensation for an alleged
17 tort. It's not only not a good vehicle to make broad public
18 statements and, again, I mean no disrespect to you.
19        MS. BOSKEY: I understand.
20        THE COURT: You should be oriented to my perception
21 of what a lawsuit is. It is not a soap box or a public forum,
22 it is an action for damages and it doesn't lend itself well to
23 airing Freedom of Information Act claims or public grievances.
24 even ones about an incident as incendiary and as important as
25 the death of your son.

## Page 13

1    It is an action for damages and one thing I'll
2  suggest you need to focus on is that's the limited purpose of
3  a lawsuit, you need a lawyer who can present your claim as
4  effectively as possible to achieve that result.  Some of these
5  other very important goals that you've expressed don't
6  dovetail very well with what a lawsuit is and what the purpose
7  of a lawsuit is.  You need to get a lawyer who -- you don't
8  want these lawyers, that's your choice, but you have to get a
9  lawyer.  I really strongly suggest you abandon any notion of
10  trying the case yourself.  Get another lawyer who can engage
11  in a transition with Mr. Beldock and Mr. Herbst and we'll try
12  the case again.
13    MS. BOSKEY:  You know, Judge Gleeson, there is no
14  amount of money in this world that will ever replace or
15  compensate for the lack of accountability and truth and
16  changes and somehow when the truth doesn't come out and you
17  see false things have been put forth, it's a pretty
18  frustrating thing to see again you're stuck with that kind of
19  thing happening.  And when you put it down to damages and
20  money, the damages are so enormous, physically it has had a
21  tremendous effect on us and financially.
22    THE COURT:  I'm not suggesting that the other wrongs
23  you've identified can't be righted but all that can be
24  accomplished here is an award of money damages.
25    I take it there's no application for injunctive

## Page 14

1  relief in the complaint, is there?
2    MR. BELDOCK:  There probably was, Your Honor, but
3  for one reason or another it was not relevant at the trial.
4    THE COURT:  And I understand how inadequate an award
5  can be to someone in your position but that's the only relief,
6  as we say in our neck of the woods, that's available in your
7  lawsuit.  These other things have to be effected, these other
8  changes, whatever it is you have in mind, have to be effected
9  in some other way.
10    MS. BOSKEY:  And the financial liens that you have
11  to deal with, it becomes quite difficult to handle or even
12  when you feel they're not appropriate or properly charged but
13  there's a lot to deal with.  I understand.
14    THE COURT:  Okay.  I don't doubt that.  We'll see
15  you in the end of January.
16    MR. SCHEINER:  Your Honor, we have one minor request
17  before that conference which is that we receive the order or
18  letters of administration or whatever was issued by the
19  Surrogate's Court appointing Ms. Boskey as the administrator
20  of the estate authorized to prosecute the lawsuit because the
21  prior plaintiff was her son, Glenn Busch.
22    THE COURT:  Any reason those can't be --
23    MR. BELDOCK:  No, I told Mr. Scheiner I'll get it,
24  I'll provide it.
25    THE COURT:  Thank you, Mr. Beldock.

## Page 15

1    Anything else?
2    MR. BELDOCK:  No, Your Honor.
3    THE COURT:  Have a nice holiday.
4    MR. BELDOCK:  Thank you, Your Honor.
5    MR. SCHEINER:  Thank you, Your Honor.
6    MR. HERBST:  Thank you, Your Honor.
7    MS. ROSSAN:  Thank you, Your Honor.
8    MS. JUNEJA:  Thank you, Your Honor.
9  (End of proceedings.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

These are some of the Corrections to the transcript before Honorable Judge John Gleeson Monday December 19, 2005: at 11:30 by Doris Busch Boskey: The words in bold were missing or misquoted, and the sequence of words was occasionally incorrect. Other things are noted.

## Page 4

Lines 2-6: Mr. Beldock: I believe said only: They are important decisions **which she will have to make,** and if you want to hear from her, she would like to address the Court and speak today. At this point I will yield to her. I think that would be best. (Nothing was said such as: "if you would like to hear from Mr. Boskey"--, etc. That is an error)

Line 18: Mr. Scheiner is incorrect: It's been **one** year since the Judge's first retrial order (**not over two** years, as the transcript says. The trial began October 21, 2003, and ended November 17, 2003. The Judge's first decision was September 9, 2004)

Page 5 I believe the Court responded to Mr. Scheiner about this, indicating that this did not prejudice the case because there was prior testimony available, etc. This appears to be out of sequence. Also Mr. Beldock mentioned the Judge's first decision wasn't two years ago, that defendants motions slowed things up, and the second decisions was recent:

Line 15: Mr. Beldock continued, I believe, which doesn't appear: we had the Judge's decision September 2004, and motions made by the defendant's delayed this. The Judge's latest decision was September 2005. (The transcript stops Mr. Beldock with: "we had-")

## Page 6

Line 10: Mr. Beldock: I did not hear Mr. Beldock say he would be "caretaker counsel and assist the Court and our adversaries and Ms. Boskey." (I believe this is misquoted)

Line 20-22: Ms. Boskey: Yes. your Honor. (The following is in my notes as having been read and said, which I believe it was, however it does not appear in the transcript. It was referred to in the Court's response on page 11.) **I had asked Mr. Beldock over ten days ago, to get an adjournment of today's status conference, since we didn't ask for enough time before. I have cardiac tests scheduled this week, and other tests may be needed after that. I wanted more time to resolve health issues as well as issues of this case.**
We have had problems **with** and have not been happy with **the representation by our attorneys.** (I did not mention the case in this sentence.)
The **only reason** we began

## Page 7

Lines 4-6: Ms. Boskey: If there hadn't been a **false and incomplete grand jury presentation in a hastily convened grand jury,** with witness and evidence tampering----- ( a false and incomplete presentation, not incomplete grand jury.)

Line 12: Ms. Boskey: when it wasn't necessary. **By not** listening to---
("By not listening" was a separate sentence.)

(Continued)

Lines 21-23: Ms. Boskey: such as conspiracy, which is **apparent** in much of the testimony and facts **gathered, denial** of his due process rights in the grand jury, as well as his civil rights, equal protection and other claims.

Line 24-25: Ms. Boskey: said here: This was more than a case of excessive force and not following procedure. (This followed lines 21-23 in this sequence, before talk about experts.)

## Page 8

Lines 1-3: Mrs. Boskey: There were experts who were used **we didn't want,** who used police documents, **reports** and premarked false sketches, **and photos taken** after evidence had been tampered with and moved. **These were used to eliminate several defendants as happened in the grand jury, that** grand jurors were not aware of, neither was the Justice Department **or** a lot of other people.

Lines 4-5: Ms. Boskey: The moving of hammer was just one thing, and there were others such as his tefillin, **ballistics and more.**

Lines 6-14: Ms. Boskey: He was never a threat, **as neighbors and witnesses have said in** depositions and **other** testimony, and even **said** on TV that night, which I didn't see **until later.** (I just saw the first few minutes of the 10:00 news) He was inside, **in the middle of prayers,** when police returned, with plans to attend a wedding later that evening. **He was shot at 6:50.** I found out almost four hours later, that he had been killed. **They admitted him to the hospital** as John Doe Homeless**, although they had his driver's license and my car registration, and were in his apartment, but never called us.** (This was what was said to show they used the time to tamper and cover up. See lines 15-23)

Line 15-25: Ms. Boskey: There was tampering with evidence, including the **small inscribed** hammer, tefillin, his clothing, ballistics and more. Much of the focus **of our attorneys was on** the first 10 minute encounter, instead of the second, **where there were compelling facts not presented, including the accurate time line and more.** There were **at least eight officers there** when he was shot **and more than four fired.** The shot to his back and one to the police car **did not come from just these officers,** but from others (officers, **not** people) **that were seen near or in the street, or coming up behind him.**
 (This and above was the sequence and what was said. The following in bold was in the wrong place and was said just before what appears in lines 24-25 "They had the facts--)
      **What is most disturbing is that the other defendants who were directly involved, as well as significant claims, have been eliminated.** They had the facts and information, yet chose, against our wishes, not to use **them.** So the purpose of

## Page 9:

Lines 5-8: Ms. Boskey: in vain. (end of sentence.) They (police) made him the perpetrator, instead of **all those involved in killing him, and covering it up.** He was inside praying, **wearing tefillin** the second time they returned.

(Continued)

Line 14-15: Ms. Boskey: **Leoncavello** (last name: became foreman), a court officer, who came in with a gun. We felt the jury **was** tainted from the beginning.

Lines 17-22: This was in answer to a question by Mr. Scheiner, which does not appear in the transcript. **I did not continue.** Mr. Scheiner asked a question pertaining to why it has taken me so long since the trial, two years, etc. I'm not sure of the sequence of this section but this doesn't appear to be in the right place. I believe this was asked later, and below was my answer.

Lines 17-22: Ms. Boskey: The reason it has taken **me** so long also is because I had health problems over the last two years, and **I had a** very bad bout of high blood pressure and almost had a stroke about a year ago, **and there was another case going on. My husband has also had problems, so I've had a lot of things going on,** so it's been very--- (said as above)

Page 10
Line 2: Ms. Boskey: son's case, **by going pro se, and** getting some help **with it.**

Lines 6-13: Ms. Boskey: No one knows it better than I do **and no one will fight as hard as I will.** (I did **not** say: "and I guess maybe no one will") I know it is a **difficult** request, but I just can't allow this to happen again. **The truth should have come out, but didn't. Very** significant things **were withheld, and there were** reports **and papers submitted** that should never have been, that used police documents **and reports** rather than **significant** witness testimony. (What appears on lines 9-10 in the transcript were **not** said: I will do whatever I can and whatever------- but I am sorry it hasn't worked out. I feel that they've tried but" I did not say this.)

Line 14-23: Ms. Boskey: A lot was kept out of this **case,** as I said, **including** that he was admitted as John Doe **Homeless,** they had him hidden, **although** they had his driver's license, my car registration, and were in **his** (not "the") apartment, **even** getting into his voice mail **at 7:10,** after he was killed. He was shot at 6:50, **which is in many** (not all) documents. I didn't learn about it until I saw it on TV **at 10:00. I called** his apartment hysterical, **not believing it,** and called the **precinct** after I found out the precinct, but no one gave me answers. **I finally got someone there he knew,** who went over there to find out if it was true. **He called me after 11:00 PM** (not 1:00) **to tell me** it was true. (Sequence and what was said as above.)
Line 24-25: This is **some of what went** on. I'm sorry to have

Page 12:
Lines 6-7: Ms. Boskey: that were incorrect and incomplete by both sides **when they had significant** witness testimony **and facts that were withheld and**

Line 23: I do not recall hearing the Court say: for airing Freedom of Information Act claims or public grievances--

Page 13
Line 13-14: Ms. Boskey: **Your Honor,** there is no amount of money in the world that will ever replace **my son,** or ---- (Continued)

Page 13 Continued:

Line 16-19: Ms. Boskey: **need for** changes. Somehow when the truth doesn't come out and you see false things have been put forth, it's a pretty frustrating thing to see **this happening again.** And when you **have** to put it **in terms of** damages and

Page 14

Lines 10-13: Ms. Boskey: **I understand. But when there are** liens you have to deal with, it becomes difficult to handle, **especially** when you feel they're not appropriate or **were** properly charged, and there's a lot **more** to deal with. (I don't recall saying "I understand" but if I did, it would have been at the beginning of the statement, not at the end.)

Line 25: Ms. Boskey: Missing: I said **"It was about a year ago."** ( told to Mr. Scheiner in reference to approximately when I became Executrix of Gary's estate when he asked about a copy of the Letters of Administration.)

The above were some of the corrections to the transcript of the status conference on Monday December 19, 2005 scheduled for 11:30 before Judge John Gleeson.

NYC 000541



NYC 000493



## CRIME SCENE UNIT SUPPLEMENTARY REPORT
PD 313-146 (12-96)-CSS3

| CSU RUN # | PRECINCT | COMP. # | INVEST. COMND | BALL # | CRIME |
|---|---|---|---|---|---|
| 99/1796 C | 66 | 6266 | I.A.B. Gp. 54 | ///////////// | ATT. MURDER M.O.S. |

| | | | | | DATE OF THIS REPORT |
| | | | SKETCH: | | September 10th. 1999 |

SCALE: AS DETERMINED
Det. J. Botte # 2433 (Assigned), C.S.U.

LEGEND

N.Y.P.D. FORENSIC DIAGRAM
Det. D.C. Austin #. 270 (Assigned)

ATT. MURDER M.O.S. 66 Pct. 08/30/99
C.S.U. Run No. 99/1796 C (Supplement)

4 Rth. STREET

NORTH

NYC 000536

0.04095".1"

C.S.U. INVESTIGATOR ASSISTING

Det. J. Botte Sh#. 2433

C.S.U. INVESTIGATOR ASSIGNED

Det. D.C. Austin D. Sh#. 270



1619 46th Street
(3) Storey End
Multi Family Residence

Concrete Driveway Area

DRIVEWAY

1625 46th Street
(3) Storey Brick
Multi Family Residence

J-11
J-10
J-9

Stair Well to Basement Apt

B-4
BLOOD

J-8
J-5
J-7

J-4    J-6

B-1

R-1

Electric Meters

R-2

Deciduous Tree

J-3
J-1  J-2

J-12

NYC-536
9/10/99

J-13

RMP 1914
66 Pct.

P

J-14
(Inside rear Engine Block)
B H.-1 (Bullet Hole). To Front Grill RMP
Operator's side @ Grill.

B

Busch v. City of N.Y.
8-28-02 GERALD ZAKIM ASSC.



ATTACHMENT 'F'